IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROBERT G. BARD,
    Plaintiff

V.

PATRICK BARD, JOHN BLACK, ALICE DOHERTY,
CARL FORNEY, KATHLEEN FORNEY, JAMES GARLAND,
LUCILLE GARLAND, MARY GARLAND, WANDA SNYDER,
LLOYD SNYDER, RALPH HANN, ANDREW SMITH,
NANCY SMITH, RONALD RICHARDS, CAROL RICHARDS,
TANA UNGER, RYAN UNGER,
    DEFENDANTS

CASE NO: 3:21-cv-185

## CIVIL COMPLAINT

RECEIVED

OCT 2 0 2021

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

PLAINTIFF:
Robert G. Bard #70720-067
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

The below defendants are being sued individually.

| | | |
|---|---|---|
| Patrick Bard | Alice Doherty | John Black |
| 8189 Great Cove Road | 8189 Great Cove Road | 807 Lions Park Drive |
| Needmore, Pa 17238 | Needmore, Pa 17238 | McConnellsburg, Pa 17233 |

Carl Forney/ Kathleen Forney
335 S. Ridge Avenue
Greencastle, Pa 17225

James Garland/ Lucille Garland
1070 Old 126
Warfordsburg, Pa 17267

Mary Garland
1131 Pleasant Ridge Road
Needmore, Pa 17238

Wand Snyder/ Lloyd Snyder
13014 Brandenburg Hollow
Smithsburg, MD 21783

Ralph Hann
2747 Mountain Road

Andrew Smith/ Nancy Smith
3861 Timber Stream Drive

Warfordsburg, Pa 17267

Southport, NC 28461

Ronald Richards/ Carol Richards
7857 Great Cove Road
Needmore, Pa 17238

Ryan Unger/ Tana Unger
558 Mill Hill Road
Warfordsburg, Pa 17267

1. Trial testimony was provided on behalf of Defendant in the case of **United States v Robert G. Bard,** 1:12-cr-00181, 3rd Circuit.

2. Government witness Beth Fuller testified at trial representing defendant's investment accounts.

3. Fuller failed to provide full transparency and understanding to defendants concerning the use of defendant's investment account

4. This Honorable Court has jurisdiction under 28 U.S.C. 1331, 1343, and 1367.

5. All defendants are prior investors of Robert Bard.

6. Robert Bard managed the defendant's investment accounts.

7. Fuller calculated all transfers to count as an Out-Of-Pocket loss.

8. Fuller has created an imminent income tax liability for all investors.

9. Defendants face paying capital gains tax/fees/penalties/interest on "phantom" stock sales that never occurred.

10. Each day accrues additional capital gains tax/fees/penalties/interest.

11. Bard would no longer be able to complete any transactions upon TD Ameritrade and Bard ceasing their relationship.

**STATEMENT OF CLAIM:**

1. The named defendants are former investors of Robert Bard. Government witness Beth Fuller of The Bates Group testified at trial. Shortly after her testimony, Fuller was no longer employed at The Bates Group. It was Fuller's first time testifying in Court. The Bates Group is located in Oswego, Oregon.

2. The defendants are named solely in this Civil Complaint because defendant's investment account information was provided through testimony and prepared exhibits at Bard's trial. This testimony and exhibits were made part of the record.

3. These exhibits and testimony place responsibility squarely on defendants for actions they had nothing to do with. Consequently, these actions placed defendants in a serious windfall taxable event with the IRS for unpaid income tax. Even though Fuller presented the false testimony, it is the defendants that are being held accountable by the IRS.

4. This complaint is being filed to give an opportunity to bring resolution for defendants and Bard as well.

5. Fuller presented a false narrative to the Honorable Court and jury concerning stock transactions in the defendant's investment accounts. Recently, Bard became aware of the full extent of the consequence of Fuller's testimony that placed defendants in an imminent tax liability. Bard sent correspondence to The Bates Group Director, Peter Klouda, requesting his help to resolve this matter without litigation. Klouda did not respond. Correcting the error would remedy the defendant's situation by removing the defendant's tax liability.

6. At no point did Fuller or the government provide full transparency to defendants concerning the way their investment accounts would be presented to the Honorable Court and the jury. Fuller presented a picture that would better serve the government's narrative. Fuller's report was presented at trial and made part of the record and final judgment was entered.

was presented at trial and made part of the record and final judgment was entered. Unfortunately, the defendants were made vulnerable and will be held accountable for stock transactions in their investment accounts that never occurred.

7. This complaint is straightforward and very simple. Fuller testified at trial that she analyzed several defendant's investment accounts managed by Bard. Fuller also prepared and presented a report concerning the defendant's investment accounts. Fuller used a cutoff date for her analysis to be the date TD Ameritrade and Bard ceased their relationship.

8. As each defendant knows, the defendant's accounts were transferred to other investment companies or kept their accounts with TD Ameritrade. TD Ameritrade removed Bard as defendant's advisor upon TD Ameritrade and Bard's relationship ceasing. TD Ameritrade transferred accounts to an "in house" account. An "in-house" account is solely managed by TD Ameritrade without an outside advisor listed on the account. These "in-house" accounts began with a "756" account number. It was an internal transfer that no longer had Bard listed as defendant's advisor.

9. Notably, Bard would no longer be able to transact any sales of stocks when Bard was removed from the defendant's investment accounts.

10. Fuller testified that these internal transfers and transfers to a different investment company were counted as a loss. Fuller claimed that Bard sold every stock in the defendant's accounts before the accounts were transferred. Defendants are fully aware stock sales did not occur and their accounts were transferred "in full." Fuller grossly misrepresented to the Honorable Court and jury that all stocks were sold upon TD Ameritrade ceasing their relationship with Bard.

11. Defendants find themselves in a position of facing capital gains tax/fees/penalties/interest on stock sales that never occurred. In time, defendants will receive tax deficiency notices for unpaid income taxes on the stock sales that Fuller claimed happened. This egregious error was committed when Fuller testified that the defendant's stocks were sold. However, the stocks

were not sold. These "phantom sales" were made part of the record and accepted as true and correct.

**12.** Not only do defendants know their accounts were transferred and not sold but the prepared exhibits/testimony by Fuller confirm that to be true as well. Fuller testified in detail as to how to understand the exhibits she prepared. Fuller prepared and presented numerous detailed investment accounts at trial. It was testified that all accounts were calculated the same way using the same calculations. Bard includes only 3 of the accounts presented by Fuller but are representative of all of the accounts analyzed.

**13.** The investment account of Patrick Bard was selected by Fuller to explain to the Honorable Court and jury. Fuller selected Patrick Bard as Fuller's report was in alphabetical order. Patrick Bard was the first investment account listed that was analyzed. Fuller testifies that stocks were "already in the account" on the date she began her analysis for the beginning time period. Fuller goes on to testify "the value of securities delivered out of the account were 23,000, those were securities that were delivered to either another account, at another brokerage firm, or to the same brokerage firm." Bard has included the exhibits detailing the investment account of Patrick Bard that Fuller was detailing (EXHIBIT 1).

**14.** Note, Patrick Bard has the same number of shares of stocks being transferred as was stated he purchased at the beginning of the time period Fuller analyzed.

**15.** Reviewing the account of Patrick Bard, Appendix 1505 matches the "sale" of the stocks to be a total of $23,821 (Column H). This matches the "Value Of Securities Delivered To Account 756-086788 in Appendix 1502. This also matches Appendix 1503 showing "Securities Out" (Column D). Notably, it's clear that the number of shares purchased in the account is the exact same number of shares that was transferred out.

**16.** In fact, Fuller shows in Appendix 1505 that Patrick Bard had 1000 shares of Advantage energy, 300 shares of Claymore Water Index, 1000 shares of DCT Indust Tr, 300 shares of First TR ISE Chindia Index, 500 shares of ISHARES MSCI Malaysia Index, 500 shares of ISHARES

MSCI Singapore Index, and 14,820 shares of L Intl Computer. Appendix 1505 also shows that every share was transferred to an "in house" account number 756-086788. Fuller erroneously calculated that the securities (stocks) being transferred to other accounts were sold creating a loss.

17. Note, Appendix 1502 for Patrick Bard shows "Total Amount In" is $80,837, "Value Of Securities Delivered To Account 756-086786" is $23,821, "Total Amount Out is $39,645 for a "Total Out-of-Pocket Loss" of ($-21,192) It is incredibly clear that Fuller simply used the value of the account on her starting date and the value of the account when TD Ameritrade and Bard ceased their relationship and made an erroneous and prejudicial calculation. Fuller calculated $80,837 - $39,545 = $21,192. Fuller claims this to be Total Out-of-Pocket Loss. This is severely flawed because she counts the transfers of the stocks as a loss. Fuller merely is looking at change in account value from one date to an ending date.

18. Bard has included two other accounts showing the exact same process/calculation of investment accounts being transferred. (EXHIBIT 2). These 2 accounts were taken from the middle of Fuller's list and at the end of her list. All investment accounts are calculated using the same method and procedure.

19. Wanda Snyder testified at trial for the government. Appendix 1670 shows "Total Amount In" is $50,727, "Value Of Securities Delivered To Account 756-111696" is $37,816, "Total Amount Out" is $46,958 for a "Total Out-of Pocket Loss" of (-$3,769). Once again, the transfer was used to calculate a loss for stocks that were not sold. It is obviously clear that Fuller testified/represented in Appendix 1673 that Snyder began with 1550 shares of Advantage Energy, 175 shares of Claymore BNY Mellon BRIC ETF, 1450 shares DCT Industr Tr, 7000 shares of Dune Energy, 335 Shares of ISHARES MSCI Brazil Index, and 325 shares of Powershares USX China Index. All stocks show being totally transferred and not sold to TD Ameritrade "in-house" account 756-111696. Appendix 1671 shows stocks ``Securities Out"

(Column D) to be $37,816. This matches Appendixes 1670 and 1673 confirming $37,816 of securities transferred out.

**20.** Ryan Unger testified at trial for the government. Appendix 1692 shows "Total Amount In" is $12,582, "Value of Securities Delivered To Account 756-086501" is $5,312, "Total Amount Out" is $6,756 for a "Total Out-of-Pocket loss" of (-$5,814). Again, the transfer of the stocks are used to create a loss. Fuller is once again very clear in Appendix 1695 that Unger started with 400 shares of Advantage Energy, 400 ISHARES of MSCI Malaysia Index, 150 shares of ISHARES MSCI Singapore Index, and 5335 shares of L Intl Computer. Abundantly clear that all shares were transferred to TD Ameritrade in-house account 756-086501 and not sold. Appendix 1693 shows stocks "Securities Out" (Column D) to be $5,312. This matches Appendixes 1692 and 1695 confirming $5,312 of securities transferred out.

**21.** Fuller then compounds the damage to defendants when she confirms that stocks were already in the account. The IRS is clear that a Zero Cost Basis must be used if the original Cost Basis is not used. Looking once again at account for Patrick Bard, he faces a tax liability of stock sales of $23,821 with a Cost Basis of Zero. The IRS assumes Patrick Bard paid Zero dollars for the stocks and the loss of $23,821 that Fuller claims - now becomes a gain of $23,821. Patrick Bard faces this tax liability for stock sales that never occurred. Fuller shows the source of her exhibits to be TD Ameritrade Statements.

**22.** The damage Fuller caused to Patrick Bard does not stop there. Patrick Bard as well as all of Bard's investors accrues daily - additional fees/interest/penalties along with the capital gains tax. Patrick Bard and all of Bard's investors increase their tax liability daily.

**23.** Importantly, not one defendant received a 1099 B for stock sales matching Fuller's testimony. TD Ameritrade sends investors a 1099 B for tax purposes to allow taxpayers to report a gain/loss on stock sales for that year. TD Ameritrade did not send any defendants a 1099 B as the stock sales did not occur. Stock sales did not occur upon TD Ameritrade and Bard ceasing their relationship.

24. Unfortunately, this extreme error affects all of Bard's investors. Testimony is clear that every defendant's account was calculated using the exact same calculation method for each account. This tax liability for all investors could be considerably well into the several millions.

25. Beth Fuller testified at trial that loss was based on Out-of-Pocket loss.

26. Out-of-Pocket Loss is Stock Purchase Price - Stock Sales Price.

27. Fuller testified that the ending date analyzed was the date TD Ameritrade ceased its relationship with Bard.

28. Fuller testified that the stocks were already in the account prior to her starting date analyzed.

29. Fuller never attempted to satisfy the requirement to know/use the actual stock purchase price (Cost Basis) when calculating gain/loss for stocks.

30. Fuller used an incorrect cost basis for the purchase price of the stocks.

31. Fuller used the price of the stock on the date her analysis started to be the purchase price (cost basis) of the stock.

32. Fuller prepared account statements and different exhibits that clearly show accounts were transferred and not sold upon Bard and TD Ameritrade ceasing their relationship.

33. Numerous transfer forms will be presented at trial/discovery showing transfers from TD Ameritrade to other Brokerage Houses in their entirety without the selling of stocks.

34. Transfer forms will show "full" transfer of accounts.

35. There can be no loss without a sale of the stocks.

36. A transfer of an account does not constitute a loss.

37. A transfer of an account does not constitute a taxable event.

38. A gain/loss can not be calculated without knowing the actual cost basis.

39. A gain/loss can not be calculated without a sale of the stock.

40. A Zero Cost Basis must be used to calculate gain/loss if cost basis is not known.

41. Without correcting, the IRS will calculate capital gains tax/penalties/interest/penalties and send deficiency notices to defendants for "phantom stock sales" that did not take place.

42. Each day increases capital gains tax/penalties/interest/penalties.

43. When taxpayers fail to carry their burden to prove cost basis for the stock, the basis utilized by the IRS, which enjoys presumption of correctness, assumes Zero Cost Basis.

44. During Discovery and at trial, evidence will show that several defendant's accounts were transferred "in full" to Todd Alexander at Edward Jones in McConnellsburg Pennsylvania.

45. During Discovery and at trial, evidence will show that several defendant's accounts were transferred "in full" to Andrew Serafini Financial Group in Hagerstown Maryland.

46. During Discovery and at trial, evidence will show that several defendant's accounts were transferred "in full" to Scottrade.

47. During Discovery and at trial, evidence will show that several defendant's accounts remained as "in-house" accounts at TD Ameritrade.

48. During Discovery and at trial, evidence will show that several defendant's accounts were transferred "in full" to WallStreetE.

49. During Discovery and at trial, evidence will show that several defendant's accounts were transferred "in full" to other Financial advisors at other Brokerage Houses.

50. During discovery and at trial, testimony would be asked of defendants and also Financial Advisors that transferred Bard's account to them at Brokerage Houses confirming accounts were transferred "in full" to the new brokerage house.

51. The IRS is able to review and order an investigation on back tax returns for an unlimited time period to recoup unpaid income tax when tax fraud is suspected.

52. Fuller's testimony places suspicion of tax fraud on defendants.

53. Bard's Constitutional Rights of Due Process and Deprivation of Liberty are violated if not corrected.

**CONCLUSION:**

54. This case is based on one date, the end date. Fuller confirmed that her ending date was when TD Ameritrade and Bard ceased their relationship. Fuller's testimony claimed stocks were sold at this time. However, the exhibits make clear they were transferred and not sold. Fuller was clear in her testimony that she counted the transfer of the accounts as a loss. Defendants are aware their accounts and stocks were transferred. Sales of the stocks did not occur when TD Ameritrade and Bard ceased their relationship.

55. Fuller's loss calculation was "tainted" and severely flawed from the beginning and the end. To calculate a gain/loss of a stock, there must be an accurate and known purchase price. There must also be a sale of the stock. Fuller had neither. The jury was led to believe that stock sales occurred when TD Ameritrade and Bard ceased their relationship. This was completely untrue. No stocks were sold upon TD Ameritrade and Bard ceasing their relationship.

56. Defendants were never told of being placed in harm's way. Now, defendants have an opportunity to begin moving forward to correct this problem. Bard estimated the income tax liability that many of his family/friends face and the tax liability they are facing is horrendous.

57. Bard's filing of this Complaint is not to harm prior "investors (defendants)" but to begin the process to remedy a serious tax liability placed on them by Fuller. From prison, Bard has very few options to correct this tremendous mistake for his family, friends, investors, and himself.

58. Unfortunately, Fuller's testimony places Bard's prior investors to be viewed now as defendants since it's their accounts that were presented falsely. Bard hopes that the filing of this Civil Complaint will help begin the process for resolution of this matter for all of his prior investors/defendants. It's very concerning that each day continues to add new charges/fees/tax/penalties to defendants. Notably, this is not an error that will go away without correcting. The tax liability will continue to increase daily until corrected.

**RELIEF:**

59. Bard is seeking to correct this egregious problem. Not correcting this problem forces defendants to accept this income tax burden and also creates a Constitution Violation of Due Process and Deprivation of Liberty for Bard. Many investors have already signed affirmations that the stock sales did not occur upon TD Ameritrade and Bard ceasing their relationship.

60. In an effort to preserve precious Judicial resources, Bard is requesting relief by defendants to affirm that their stocks were not sold upon TD Ameritrade ceasing their relationship with Bard. A fact defendants already know. As defendants sign and return the affirmations to Bard, Bard will file a petition to the Honorable Court to remove/dismiss from this Civil Complaint each defendant that returns the Affirmation.

61. Discovery would be necessary for those that do not return the signed affirmation as Bard would seek to have produced investment records/transfers of the defendant's account. Bard is requesting this Honorable Court to GRANT discovery and set a briefing schedule and trial date.

A Jury Trial demanded.

Respectfully Submitted,

Robert Bard, pro-se
Federal Number 70720-067
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

## CERTIFICATE OF SERVICE

I, Robert G. Bard, do hereby certify under the penalty of perjury that I mailed a true and correct copy of the Civil Complaint and Waiver of Service to defendants below. This service is in full accordance with Rule 5.1 to cause service, at minimum, to the last known address.

PATRICK BARD
JOHN BLACK
ALICE DOHERTY
CARL FORNEY
KATHLEEN FORNEY
JAMES GARLAND
LUCILLE GARLAND
MARY GARLAND
WANDA SNYDER
LLOYD SNYDER
RALPH HANN
ANDREW SMITH
NANCY SMITH
RONALD RICHARDS
CAROL RICHARDS
TANA UNGER
RYAN UNGER

Respectfully Submitted;

Robert G. Bard, pro-se
Federal Number: 70720-067
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

## AFFIRMATION OF ROBERT G. BARD
## PURSUANT TO 28 U.S.C. 1746

I, Robert G. Bard, declare under the penalty of perjury that the statement(s) made in the attached Civil Complaint are true and correct to the best of my knowledge, recollection, and understanding. This affirmation is made pursuant to 28 U.S.C. 1746.

Submitted this __18th__ day of __October__, 2021

_____
Robert G. Bard, pro-se
Federal Number 70720-067
FCI Loretto
P.O. Box 1000
Cresson, PA 16630

## AFFIRMATION OF ROBERT G. BARD
## PURSUANT TO 28 U.S.C. Section 1746

I, Robert G. Bard, do depose that the following is the best of my knowledge, recollection, and understanding.

1. I did not sell investor's stocks upon TD Ameritrade ceasing their relationship with me.

2. I would be unable to transact any trading activity in investor's TD Ameritrade accounts upon my relationship with TD Ameritrade ceasing.

I declare that the foregoing is true and correct to the best of my knowledge and belief and is given under the penalty of perjury pursuant to 28 U.S.C. Section 1746 signed on the below date.

Respectfully Submitted;

Robert G. Bard/pro-se

DATE: 10/18/21